**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| MEDLINE INDUSTRIES, INC., | ) | FILED: MAY 9, 2008 |
|  | ) | 08CV2681   EDA |
| Plaintiff, | ) | JUDGE DOW |
|  | ) | MAGISTRATE JUDGE COX |
| v. | ) |  |
|  | ) | Case No. |
| BSN MEDICAL GMBH and BSN MEDICAL, | ) |  |
| INC., | ) |  |
|  | ) | JURY DEMANDED |
| Defendants. | ) |  |
|  | ) |  |
|  | ) |  |

## COMPLAINT

Plaintiff Medline Industries, Inc. ("Medline"), by its attorneys, Tabet DiVito & Rothstein LLC, and for its complaint against defendants, BSN Medical GmbH ("BSN GmbH") and BSN Medical, Inc. ("BSN, Inc.) (sometimes collectively referred to as "BSN") states as follows:

### INTRODUCTION AND NATURE OF THE ACTION

1.      Medline brings this complaint against BSN for tortious interference with its exclusive Distribution Agreement with Ossur HF ("Ossur").  Well aware of Ossur's contractual commitment with Medline for the exclusive distribution of Ossur's wound and scar care products ("Products") in the United States and Puerto Rico ("the Territory"), BSN nevertheless induced Ossur to sell it its wound care product line and U.S. intellectual property rights relating to their products, and thereby breach its 5 ½ year exclusive distribution agreement with Medline.

2.      The Ossur/Medline relationship was formed in 2004, when the two companies entered into an agreement wherein Medline would become the exclusive distributor of Ossur's

wound and scar care products in the Territory for a minimum of five and one-half years, and potentially for much longer.

3.      Medline fulfilled all of its contractual obligations, investing millions of dollars developing an infrastructure to sell, market, distribute, promote and support Ossur's Products. Now that Ossur has enjoyed the benefits of Medline's investments and the substantial work Medline performed in connection with its contractual commitments, Ossur has breached its promise that Medline would have the exclusive right to sell its products in the Territory for at least until January 16, 2010.  On March 31, 2008, BSN and Ossur announced that BSN has acquired Ossur's advanced wound care product line in a multi-million dollar transaction and, in connection therewith, Ossur notified Medline that it has terminated the Ossur/Medline agreement and intended to cease all further Product shipments.

4.      BSN's tortious interference with the Ossur/Medline contract has and will inflict significant harm on Medline.  BSN's acquisition, and the corresponding termination of the Ossur/Medline Agreement, has caused Medline to suffer the intolerable fate of having to reject customer orders and has tarnished Medline's business reputation as one of the top customer service companies and "on-time" suppliers in the country.  Moreover, lacking the ability to offer a complete line of wound care products, Medline has and will lose "pull through" sales and will face huge obstacles in maintaining its market share in this business segment and its goodwill, jeopardizing the entire value of the millions of dollars it has invested in Ossur's Products.

5.      By this action, Medline seeks an award of damages against BSN for its intentional and tortious inducement of Ossur's breach of its contract with Medline.

**THE PARTIES**

6.      Plaintiff Medline is an Illinois corporation with its principal place of business located at One Medline Place, Mundelein, Illinois 60060.  Medline is the largest privately-held national manufacturer and distributor of health care supplies and services. Medline has 29 distribution centers to deliver products to its health care customers.  Medline has earned a reputation as one of the top sales and customer service companies in the United States and has received numerous awards for its ability to timely meet the demands of its many customers. Through its Distribution Agreement, Medline has the exclusive right to sell, market, distribute, promote and support Ossur's wound and scar care products in the United States and Puerto Rico.

7.      Defendant BSN GmbH is a corporation organized under the laws of Germany and is headquartered in Hamburg, Germany.  It is a global leader in the worldwide healthcare market specializing in, among other things, the area of wound care.  On information and belief, it has manufacturing facilities in France, Germany, Ireland, Mexico, New Zealand, Pakistan, South Africa, the United Kingdom, and the United States, and it maintains sales and marketing operations in each of those markets.  BSN GmbH was originally formed as a joint venture in 2001 between Beiersdorf and Smith & Nephew plc.  In 2006, it was acquired by funds advised by the European-based Montagu Private Equity.

8.      Defendant BSN, Inc., is a North Carolina corporation with its principal place of business located at 5825 Carnegie Boulevard, Charlotte, North Carolina 28209.  It is a wholly-owned subsidiary of BSN Medical GmbH.  On information and belief, BSN, Inc. oversees BSN GmbH's activities in the United States, including the sale of wound care products in the Territory.

## OTHER CONTRACTING PARTY

9.      Ossur is a limited liability company incorporated under the laws of Iceland and is headquartered in Reykjavik, Iceland.  On information and belief, Ossur has extensive operations in the Americas, Europe and Asia, with numerous distributors in other markets, including the United States.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332.  This action is between citizens of different States, and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

11.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(a) and (c).

## FACTUAL BACKGROUND

**Advanced Wound Management**

12.     The advanced wound management business includes a range of dressings designed to create an optimum environment for wounds to heal.  Advanced wound care products are targeted at a variety of chronic wounds, such as pressure sores and venous leg ulcers, and the alleviation of wounds resulting from such things as burns and invasive surgery.

13.     On information and belief, prior to July 2004, when Ossur and Medline entered into the Distribution Agreement, the primary competitors in the United States market for advanced wound management were Smith & Nephew plc, a 50% owner of BSN until 2006, Bristol-Myers Squibb, Molnlyke, and Johnson & Johnson.

14.     Prior to July 2004, Ossur did not market or sell its wound and scar care products, including "Gentleheal", in the United States or Puerto Rico.  The entry of Ossur/Medline in the wound care market increased competition in the Territory and, on information and belief,

ultimately led to decreases in market share for some or all of the Territory's market participants, including BSN.

15.     As of the end of 2007, sales in the advanced wound management market worldwide were approximately $4.7 billion.

**Medline/Ossur Distribution Agreement**

16.     On July 16, 2004, Medline entered into a distribution agreement with Ossur.  The Distribution Agreement between Medline and Ossur (excluding Exhibit B to the Distribution Agreement) is attached hereto as Exhibit A.

17.     On information and belief, Ossur entered into the Distribution Agreement with Medline in order to establish a relationship with a company that had the experience and expertise in the marketing and sale of such products in the Territory and thereby capture at least a portion of the lucrative U.S. market for wound care products.

18.     Accordingly, the Distribution Agreement gave Medline the exclusive right to distribute, sell, promote and market a complete line of Ossur's silicon-based wound and scar treatment products in the United States and Puerto Rico.  (Exh. A at § 2.1.)  Medline's exclusive right to market and sell the complete line of Ossur's products included not only Ossur's then-existing products, but also all product extensions, foam products and any new products.  (*Id.* at § 1.11.)

19.     By contracting with Ossur, not only was Medline able to offer its customers and potential customers a complete line of wound care products, but it was also able to use the Ossur products during its sales calls to "pull-through" sales for its other wound care products and the rest of its product portfolio.

20.     In agreeing to become Ossur's exclusive distributor, Medline agreed and understood that it would have to make significant investments in order to develop a market for Ossur's products in the Territory.   In particular, and among other things, Medline conducted periodic product promotions; maintained a well-staffed and appropriately trained and supervised sales force; marketed the products to both potential and existing customers; launched advertising campaigns for the products; and displayed the products in its catalogs and promotional materials, on its website, at trade shows and at conferences.  Indeed, Ossur's wound care products became one of the centerpiece products for Medline's sales representatives.

21.     In total, Medline invested millions of dollars in the extensive promoting, marketing and sale of Ossur's products in the Territory.  As a result of Medline's efforts, a market for Ossur's products in the Territory was created and sales of those products, and other Medline products, have increased as a result.  Furthermore, Medline has built up substantial goodwill in the Territory that is critical to its operations and its business success in this business segment and, indeed, other business segments.

22.     Medline agreed to make such a substantial investment, and to expose its customers and potential customers to Ossur's product line, in part, because of the uniqueness of Ossur's product, which was a silicone and foam-based product that used a special polymer for absorption.

23.     More importantly, Medline agreed to become Ossur's exclusive distributor based on Ossur's written assurance that the Medline/Ossur business relationship would be for a minimum of 5 ½ years (the "Initial Term"), and potentially for much longer.  (*Id*. at § 10.1.)  In other words, Ossur induced Medline to invest millions of dollars to establish a market for Ossur's products in the Territory with the promise that it would have at least 5 ½ years to realize

6

a return on its investment. Indeed, Ossur agreed that not only would the parties' agreement be for at least 5 ½ years, but that their agreement "shall automatically renew for successive renewal terms" of one year, unless either party notified the other party in writing of its election not to renew the Agreement, not less than ninety (90) days prior to the expiration of the Initial Term or any renewal term. (*Id*.)

24.     Even then, the terms of the Distribution Agreement assured Medline that in the event Ossur decided to terminate it upon expiration of the Initial Term, Medline would have sufficient product to meet the demands of its customers and have time to find an alternative supplier. (*Id*. at §§ 10.4 & 7.3.)

25.     Section 10.4 of the Distribution Agreement provides:

> Effect of Termination. Any expiration or termination of this Agreement shall not alter the rights, duties and obligations of the parties for any purchase orders placed by Medline, or amounts due, prior to the date of such expiration or termination. . . .

26.     In addition, Section 7.3 of the Distribution Agreement requires that Ossur must "meet Medline's requirements for Products" as they are set forth in Medline's most recent six-month forecast.

27.     Medline has performed all of its obligations under the Distribution Agreement.

**BSN's Acquisition Of Ossur's Wound Care Product Line**

28.     On March 31, 2008, Ossur and BSN announced that BSN had bought Ossur's advanced wound care product line. The transaction is valued at between $11 million and $17 million. On information and belief, the transaction was completed on the day that it was announced.

29.     On information and belief, at the time BSN agreed to purchase Ossur's advanced wound care product line, it knew and was aware of the Ossur/Medline Distribution Agreement. On information and belief, BSN also knew that its purchase of the Ossur wound care product line would cause Ossur to breach its agreement with Medline. Nevertheless, BSN went forward with its purchase.

30.     As part of the terms of the sale to BSN, Ossur also sold certain intellectual property rights to the products now being promoted, marketed and sold by Medline. As a result, Ossur's products no longer will be available for sale in the Territory. Among other things, this jeopardizes Medline's existing wound care business because it deprives the company of the ability to offer for sale a complete line of wound care products to its customers. It also jeopardizes other Medline business segments, as the company's sales force can no longer offer one of its centerpiece products to its customers and potential customers.

31.     In buying Ossur's wound care product line, and refusing to sell Ossur's products in the Territory, not only did BSN GmbH induce Ossur to breach its contract with Medline, but it effectively reduced competition in the market place, thereby benefitting itself and its wholly-owned subsidiary, BSN, Inc. On information and belief, BSN GmbH's acquisition may also benefit Smith & Nephew plc and/or its United States subsidiary, Smith & Nephew, Inc.

**Ossur's Breach Of The Distribution Agreement**

32.     On March 27, 2008 and again on March 31, 2008, Ossur sent a letter to Medline, announcing its decision to terminate the Distribution Agreement as of March 31, 2008. True and correct copies of the March 27, 2008 and March 31, 2008 letters are attached hereto as Exhibits B and C, respectively.

33.     In its March 27, 2008 letter to Medline, Ossur stated:

Ossur has decided to discontinue its Gentleheal silicone-based wound dressing business, and in furtherance of this decision has entered into an agreement to sell the assets related to this business and to grant certain rights to acquire U.S. intellectual property relating to these products to a third party [BSN]. We expect that the Gentleheal business will continue outside the United States following a re-launch of the product line at some later time this year by the third party acquiring this business.

As a result of our decision, Ossur wishes to notify Medline that it intends to cease further shipments of Products to Medline after the end of this month, and that it wishes to terminate, effective March 31, 2008 (the "Termination Date"), the Distribution Agreement, dated as of July 16, 2004. . . .

34.    In its March 31, 2008 letter to Medline (Exhibit C), Ossur confirmed its intention to terminate the agreement nearly two years prior to its initial term and to not provide Medline with sufficient product to meet the demands of its customers for the duration of the parties' agreement:

This letter is to confirm that the letter referred above [*sic*], of 27th of March 2008, terminates the distribution Agreement, dated as of 16 July 2004 between Ossur hf. and Medline Industries, effective 31 March 2008.

35.    Ossur's termination of the Distribution Agreement nearly two years prior to the expiration of its initial 5 1/2-year term, and with only four days written notice, constitutes a definitive breach of the Distribution Agreement.  Under that Agreement, Ossur is required to allow Medline to sell its Products for a minimum of 5 ½ years.

36.    In addition, in stating that it would cease all further product shipments to Medline after the end of March 2008, Ossur has definitively breached the Distribution Agreement by refusing to supply Medline with sufficient products in accordance with Section 7.3 and 10.4 of the Distribution Agreement.

37.     BSN's interference with the Ossur/Medline contract, resulting in Ossur's breach of that agreement, has and will cause Medline substantial harm.  Medline will not be able to satisfy the demands of its customers and potential customers.  Medline will lose sales and "pull-through" sales.  Medline's business reputation will be significantly harmed.  Medline will face enormous obstacles in maintaining its market share in this market segment and its goodwill. Medline will lose some or all of the value of its investment in Ossur's wound care product line.

38.     Medline has attempted to resolve this dispute directly with Ossur through business negotiations.  Neither Ossur nor BSN, however, have agreed to provide Medline with the products it needs in order to continue to meet its customers' needs and to avoid the inevitable harm to its reputation and loss of goodwill.

## COUNT I

## TORTIOUS INTERFERENCE WITH CONTRACT

39.      Medline incorporates and re-alleges paragraphs 1-38 as if fully set forth herein.

40.     When BSN negotiated with Ossur toward the acquisition of Ossur's advanced wound care product line, and the attendant U.S. intellectual property rights, the Distribution Agreement between Medline and Ossur existed.

41.     On information and belief, throughout the negotiations between BSN and Ossur, BSN has known of the existence of the Distribution Agreement Ossur had with Medline. Specifically, BSN knew that the Distribution Agreement obligated Ossur to allow Medline to promote, market, sell and distribute Ossur's wound care products in the Territory for a minimum of 5 ½ years, and potentially for much longer.

42.     On information and belief, BSN knew that consummation of its acquisition of Ossur's advanced wound care product line, and attendant U.S. intellectual property rights, would induce or cause Ossur to breach and repudiate the Distribution Agreement.

43.     On information and belief, BSN induced or caused Ossur to breach and repudiate the Distribution Agreement in order, among other reasons, to recapture some or all of the advanced wound care business it had lost as a result of Medline's entry into the market through its contract with Ossur.

44.     BSN was not justified in inducing or causing Ossur to breach and repudiate the Distribution Agreement.

45.     Ossur's breach of the Distribution Agreement has damaged Medline in an amount to be determined at trial.

WHEREFORE, Medline prays for relief and judgment:

A.     Assessing damages against BSN GmbH and BSN, Inc. in an amount to be determined at trial;

B.     Awarding Medline attorney's fees and costs associated with this action to extent permitted by law; and

C.      Awarding any such other and further relief as may be just and proper.

Respectfully Submitted,
MEDLINE INDUSTRIES, INC.

By: /s/ Christopher D. Liguori
One of Its Attorneys

Dated:  May 9, 2008

Christopher D. Liguori (Bar # 6196499)
Daniel I. Konieczny (Bar # 6275293)
TABET DIVITO & ROTHSTEIN LLC
209 S. La Salle St., 7th Floor
Chicago, IL  60604
Tel: (312) 762-9450
Fax: (312) 762-9451

08CV2681
JUDGE DOW
MAGISTRATE JUDGE COX

# Exhibit A

EXECUTION VERSION

## DISTRIBUTION AGREEMENT

This Distribution Agreement (this "Agreement") is entered into as of July 16, 2004, by and between OSSUR, HF, a limited liability company incorporated under the laws of Iceland ("Ossur"), and MEDLINE INDUSTRIES, INC., an Illinois corporation ("Medline"). Ossur and Medline are sometimes collectively referred to herein as the "parties" and each individually as a "party".

WHEREAS, Ossur has developed and is developing certain silicon-based wound and scar care products, and desires to enter into an arrangement for the marketing and distribution of such products with a firm experienced in the marketing and sale of such products in the United States of America and Puerto Rico (collectively, the "Territory"); and

WHEREAS, Ossur has developed and is developing and selling certain other products unrelated to the Field (as hereafter defined), all rights to which are fully reserved by Ossur; and

WHEREAS, Medline desires to obtain rights to purchase and resell certain of Ossur's products in the Territory, and Ossur is willing to grant such rights to Medline, all under the terms and conditions set forth in this Agreement; and

WHEREAS, the parties will mutually benefit from cooperation under this Agreement in order to maximize the sales of the Products (as hereafter defined) within the Territory.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

## 1.　Definitions

For the purpose of this Agreement, the following terms shall have the definitions set out hereunder:

1.1.　"Confidential Information" means any confidential or proprietary information of either party, including but not limited to any business, financial or marketing information, business plans, or financial, legal or personnel matters related to either party, whether in oral, written, graphic or electronic form. Confidential Information shall not include any information which:

　　a)　is now, or hereafter becomes, through no act or failure to act on the part of the Receiving Party, generally known or available or readily ascertainable through publicly available sources without reference to or use or benefit of any other Confidential Information;

　　b)　is properly in the possession of the Receiving Party at the time it received such information, as evidenced by its records;

　　c)　is hereafter furnished to the Receiving Party by a third party, as a matter of right and without breach of a confidentiality obligation to the other party or any of its affiliates;

d)   is independently developed by the Receiving Party without the aid, application or use of Confidential Information of the other party;

e)   was or is disclosed by the Disclosing Party to any third party (excluding the Disclosing Party's employees, consultants, advisors and other representatives) on an unrestricted basis;

f)   is the subject of a written authorization to disclose from the Disclosing Party; or

g)   is required to be disclosed by any government agency, provided that the Receiving Party shall give the other party reasonable notice of such requirement and shall afford the other party the opportunity to prevent such disclosure, and cooperate with the other party regarding the same.

1.2.   "Disclosing Party" has the meaning set forth in Section 9.1;

1.3.   "Effective Date" means the date of first commercial launch by Medline of the Products in the Territory, or the date that is three (3) months from the date of this Agreement, whichever is earlier;

1.4.   "Field" shall mean the field of silicon-based wound and scar treatment;

1.5.   "Foam Products" shall mean those certain wound treatment products, as set forth on the Price Lists, to be manufactured by Ossur, which products will not contain the silicon or super-absorbent materials contained in other Products.

1.6.   "Force Majeure" means any event beyond reasonable control of either party, which prevents such party from or delays the performance of any of its obligations under this Agreement, including but not limited to: accident, explosion, fire, storm, earthquake, flood, drought, riots, civil disobedience, sabotage, terrorist acts, civil war or revolutions, war, government action, failure or delay of transportation beyond the point of export, the bankruptcy of any third party supplier, failure to obtain or subsequent suspension of any export or import licenses, visas or similar licenses and permits or any other event beyond the party's reasonable control;

1.7.   "Marketing Plan" means the report to be delivered periodically by Medline to Ossur pursuant to Section 8.4 hereof;

1.8.   "New Product" means any product for use within the Field first manufactured or developed by Ossur and/or any of its Subsidiaries following the date hereof, which product is not a Product at such time, and which product does not incorporate the absorbent and adhesive materials of an existing Product, or is or would reasonably be expected to be sold in the ordinary course of business under a different brand name than any existing Product;

1.9.   "Ossur Brand" means any patent, trademark, trade name, design, logos or copyright relating to the Products, used, claimed or owned by Ossur and/or any of its Subsidiaries;

2

1.10.   "Price List" means the price list set forth in Exhibit A, which shall include a list of the Products and their corresponding transfer prices to Medline, as the same may be modified in accordance herewith;

1.11.   "Products" means the silicon-based wound and scar treatment products, under any or no brand name, manufactured or sold by Ossur (whether directly or indirectly through any of its Subsidiaries) for use within the Field, as set forth in the Price Lists, together with all Product Extensions as may be more particularly added to the Price Lists from time to time in accordance with Section 6.3. For the avoidance of doubt, the terms "Product" and "Products" as used in this Agreement includes and encompasses all Product Extensions and Foam Products, as well as any New Products which are added to the Price Lists from time to time in accordance with Section 6.2 hereof. Subject to Sections 2 and 6.9 below, Products on the Price Lists are subject, at any time and at Ossur's sole discretion, to addition, deletion, modification or change in design or specification. Foam Products shall, upon their availability as described in Section 6.4, automatically become Products hereunder, notwithstanding their inherent inapplicability to the Field;

1.12.   "Product Extension" means any product for use within the Field first manufactured or developed by Ossur and/or any of its Subsidiaries following the date hereof, which product is not a Product at such time, and which product incorporates the absorbent material and/or adhesive material of an existing Product but in a thickness and size in which such Product was not previously available and which is or would reasonably be expected to be sold in the ordinary course of business under the same brand name as such Product;

1.13.   "Product Manager" means the product manager appointed by Medline in accordance with Section 3.3 for the purposes of this Agreement;

1.14.   "Receiving Party" has the meaning set forth in Section 9.1;

1.15.   "Subsidiaries" means Ossur's fully owned subsidiaries;

1.16.   "Term" means the term of this Agreement, as set forth in Section 11.1;

1.17.   "Territory" has the meaning set forth in the recitals hereto;

1.18.   "Quota Period" means the eighteen (18) month period beginning on the Effective Date, and each successive twelve (12) month period thereafter.

## 2.   Appointment of Medline

2.1.   Ossur hereby grants Medline the exclusive right, in accordance with the terms of this Agreement, to distribute, sell, promote and market the Products in the Territory for use and sale within the Field (except that Foam Products shall inherently be sold and used outside the Field) by and to persons that are within the Territory, and Medline hereby accepts such appointment. In no event shall Medline directly or indirectly sell, market or distribute the Products outside of the Territory or for use outside the Field.

2.2.   Except as stated in or Section 6.2 or otherwise permitted under this Agreement and unless and until this Agreement shall have been terminated in the manner provided herein, Ossur agrees

3

not to distribute, market or sell, or to authorize, appoint or license other persons to sell, the Products within the Territory and for use within the Territory and the Field, except for sales to Medline. Ossur represents that it has not made, and covenants that it shall not make, any appointment inconsistent with the appointment and limitations within this Section 2, except as otherwise permitted by the terms of this Agreement. Without prejudice to any other remedy of Ossur hereunder, upon the failure of Medline to perform its obligations under Section 3.1 below with respect to any Product, which failure is not cured within 30 days of notice thereof to Medline by Ossur, Ossur shall not be restricted from distributing, marketing or selling, or authorizing any other person to distribute, market or sell, such Products within the Territory and for use or sale within the Territory and the Field.

## 3.    Medline's Obligations

3.1.    Medline shall use its commercially reasonable efforts to sell, market, distribute, promote and support all the Products on a continuous basis throughout the Term and throughout the entire Territory. Without derogating from the generality of the foregoing, Medline's efforts hereunder shall be at least commensurate with the level of efforts Medline would normally exercise for similarly situated products distributed, marketed or sold by Medline. Medline shall use its commercially reasonable efforts to ensure that sales of Foam Products, as a percentage of all Product sales, shall decrease from year to year, and that sales of all other Products increase from year to year. Medline's obligations to market the Products under this Agreement shall require Medline, among other things, to: (i) conduct periodic promotions with respect to the Products; (ii) maintain a well-staffed and appropriately trained and supervised sales force; (iii) present the Products to customers and potential customers; (iv) maintain adequate levels of Product inventory; and (v) display the Products in its catalogs and other promotional materials and its pertinent websites, at trade shows, congresses and similar conferences, and, as necessary or appropriate, at sales and training courses and programs for Medline sales and marketing personnel, all no less prominently than Medline currently does so for similarly situated products.

3.2.    Medline shall sell the Products solely under the applicable Ossur Brand(s) in accordance herewith, and shall not remove, cover or erase any Ossur Brand which Ossur and/or any of its Subsidiaries may place on or affix to the Products. Medline shall ensure that the applicable Ossur Brand is a prominent mark in all Product promotions, advertising materials and the like used by Medline in performing its duties hereunder. Ossur hereby consents to the use of the Ossur Brands in the Territory by Medline solely in connection with the marketing and sale of Products as provided herein and otherwise in accordance with the terms of this Agreement. Medline shall at all times adhere to good and sound business practices and carry out its obligations hereunder according to the highest standards of professional business conduct.

3.3.    Medline shall assign a Product Manager with the appropriate technical and marketing qualifications to assist in and manage the sale, distribution and promotion of the Products throughout the Territory.

3.4.    Medline shall not intentionally or knowingly do anything that may prevent or interfere with the sale or the development of sales of the Products in the Territory.

4

3.5. Medline will not solicit Product orders from or make deliveries to end-users or third parties outside its Territory.

3.6. Medline agrees not to commence or initiate, or to cause to be commenced or initiated, any engineering, research, development or other technical activities on any of the Products or otherwise using Ossur's intellectual property without the prior written consent of Ossur. At any time during or after the term of this Agreement, Medline shall not take any action to challenge or assist any other person in challenging the validity of any claims of patents or other intellectual property of Ossur related to any Product.

3.7. Any and all of Medline's marketing, promotional, sales and administrative costs associated with attendance at or participation in trade shows, congresses or similar conferences shall be borne by Medline at its sole expense.

3.8. Medline agrees during the Term of this Agreement not to: (i) manufacture, distribute, sell or promote in the Territory any goods that are directly competitive with the Products; (ii) have any interest, directly or indirectly, in the importation into the Territory of any such competitive goods; or (iii) copy, produce, make, modify or manufacture or assist any other party to copy, produce, make, modify or manufacture the Products or any part thereof for use, sale or any other purpose. Medline further agrees, beginning on such date as the Foam Products are made available to Medline for sale within the Territory and until the termination or expiration of this Agreement, not to manufacture, distribute, sell or promote in the Territory the "Optifoam" line of products theretofore sold by Medline, or any similar products, other than the Foam Products.

## 4. Compliance With Law – Required Consents

4.1. The parties shall comply with all applicable laws and regulations relating to the sale and distribution of the Products and the performance of their respective duties and obligations hereunder. Consistent with established industry standards and applicable law, neither party shall pay or make any gift of value, directly or indirectly, to any officer, employee or agent of a political party, government or administrative agency or to any candidate for public office, for the purpose of obtaining or referring business related to the Products.

4.2. Ossur shall be responsible for clearing all Products through customs and for complying with all other import formalities into the Territory, but Medline shall promptly reimburse Ossur for all customs or other duties paid by Ossur to a governmental authority in the Territory in connection with the import of Products into the Territory.

4.3. On or prior to the Effective Date, Ossur shall obtain and maintain all applicable permissions, consents, registrations, notifications, licenses, type approvals and the like (including, without limitation, those required to be given by any government department or any body constituted under the law of the Territory for licensing or other regulatory purposes relating to the Products) in the Territory in respect of the Products necessary to enable Medline to market, distribute and sell the Products (collectively, the "Required Approvals"). Any such Required Approvals shall be in the name of Ossur unless prohibited by law, in which case they shall be held in trust by Medline acting as in-country caretaker for Ossur, and shall be subject to transfer, cancellation, modification or supplement for Product changes at Ossur's direction.

5

## 5.   Inquiries

Ossur shall, during the Term of this Agreement, promptly refer all inquiries received by it for the sale of Products in the Territory to Medline. Medline shall during the Term of this Agreement promptly refer to Ossur all inquiries it receives for the sale of Products outside the Territory, as well as any other inquiry (other than a purchase order or potential purchase order originating within the Territory) from the public, any governmental authority, any trade association or any news media, publication or reporter concerning the Products or Ossur.

## 6.   Purchase Requirements; Terms of Sale

6.1.   Purchase Requirements. During the Term of this Agreement, Medline shall place orders from Ossur for not less than the value of Products set forth in the purchase requirements per Quota Period set forth in Exhibit A (the "Purchase Requirements"). Medline shall be relieved of its responsibility to purchase a pro rata portion the Purchase Requirements with respect to a particular Product during such periods as such Product is not available for sale within the Territory, all as set forth on Exhibit A.

Medline shall, in its sole discretion, have the right, but not the obligation, to adjust the Purchase Requirements for each Quota Period subsequent to the initial Quota Period by notice in writing to Ossur delivered not less than thirty (30) days prior to the start of such Quota Period. In the event that the Purchase Requirements set by Medline for any Quota Period are lower than the Purchase Requirements for the immediately preceding Quota Period, Ossur shall, in its sole discretion, have the right, but not the obligation, to terminate this Agreement on thirty (30) days written notice to Medline. In the event that Medline fails to satisfy the Purchase Requirements in any Quota Period subsequent to the initial Quota Period, Ossur's sole remedy with respect to such failure shall be to terminate this Agreement in accordance with Section 10.2, and under no circumstances shall Medline be liable for damages for any such shortfall or be required to take or pay for the difference between its actual purchases and the Purchase Requirements for any Quota Period subsequent to the initial Quota Period; provided; however, that Medline acknowledges and agrees that it is obligated hereunder to purchase the entire Purchase Requirements set forth for the initial Quota Period, in the initial Quota Period. Notwithstanding the foregoing, and solely with respect to Foam Products (and no other Product), Medline shall not be obligated hereunder to Purchase the value of Foam Products set forth on Exhibit A in any Quota Period, it being acknowledged that such values are for guidance purposes only.

6.2.   New Products. If Ossur develops New Products for use and application within the Field and within the Territory, then Ossur shall negotiate exclusively with Medline the terms and conditions for adding such New Products to the Price Lists (and thus making such New Products "Products" hereunder subject to the provisions hereof) for a period of sixty (60) days prior to any commercial launch of such New Product within the Field and within the Territory. If the parties are unable to agree on the terms and conditions of sale of such New Products, including a minimum Purchase Requirement therefor and transfer prices thereof, during such sixty-day period, then Ossur shall be free to market, distribute and sell such New Products within the Territory and within the Field, either alone or through one or more distributors, without any effect on any other term of this Agreement.

6.3.　Product Extensions. As promptly as practicable, Ossur shall notify Medline of the availability of any Product Extension for use within the Field and for use and sale within the Territory, together with transfer prices for the same, and Medline in its sole discretion, may include such Product Extension in this Agreement, whereupon the Price Lists shall be updated to incorporate the Product Extension as "Products" hereunder. Purchases of such Product Extensions shall count towards Medline's Purchase Requirements. Medline shall promptly add such Product Extensions to its rolling 6-month forecasts delivered pursuant to Section 7.3. Gentleheal AG shall automatically become a "Product" hereunder and be added to the Price Lists at such time as it is approved for use and sale within the Territory. The parties shall negotiate in good faith the transfer price to Medline of such product.

6.4.　Product Availability. Ossur represents and warrants to Medline that: (i) the Gentleheal Standard (3mm), Gentleheal Bevel, Gentleheal Border, Gentleheal Sacral and Gentleheal Heel Products shall be made available to Medline for sale within the Territory on or prior to the end of the initial Quota Period; (ii) the Gentleheal Ag Product shall be made available to Medline for sale within the Territory on or before June 30, 2005; and (iii) the Foam Products shall be made available to Medline for sale within the Territory on or before September 30, 2004. In the event that any of such Products are not so made available by the dates specified above, Medline shall be entitled to terminate this Agreement, in each case on thirty (30) days' written notice to Ossur. Ossur further represents and warrants that the Products listed on the Price Lists on the date hereof are the only products manufactured by Ossur for sale or use within the Field on such date.

6.5.　Delivery; Shipment Costs. Delivery of the Products purchased hereunder shall be made ex works Ossur's United States warehouse or such other location as Ossur may from time to time notify Medline. Ossur shall have the right to make partial shipments and each partial shipment shall be deemed a separate sale; provided, however, that Ossur shall use commercially reasonable efforts to reduce shipping costs by avoiding making partial shipments whenever practicable. Medline shall be responsible for all freight, shipping, insurance, handling and other transport costs, import duties, taxes, levies, charges incurred in uplifting Products from Ossur's United States warehouse and transporting the Products to their end destination in the Territory.

6.6.　Manufacture of Foam Products. Ossur shall use its commercially reasonable efforts to design and manufacture the Foam Products so that they are at least equivalent in performance to the "Optifoam" line of products heretofore sold by Medline, and so that the Foam Products are similar in look to such "Optifoam" products. In no event shall Ossur be required by the foregoing to violate the intellectual property rights of any person, including without limitation the manufacturer of the "Optifoam" products.

6.7.　Packaging. Ossur shall be responsible for the final packaging of Products in sterile form. Ossur shall design all Product packaging in consultation with Medline so that such packaging conforms in all respects to the packaging and labeling requirements of applicable law and this Agreement. Product packaging shall identify the Product as being "*manufactured for Medline Industries, Inc. by Ossur hf*" or language of similar import. Medline agrees not to alter, treat or otherwise modify any of the Products or their labeling or packaging without obtaining the prior written consent of Ossur.

7

6.8.    Price; Payment. Medline shall pay to Ossur the prices for the Products as set forth in the Price Lists, as adjusted in accordance therewith or as may be otherwise mutually agreed by the parties from time to time, within thirty (30) days of receipt of the invoice for such Products. Any late payment of amounts not subject to bona fide disputes of which Ossur has been properly notified will be assigned a monthly service fee equal to 1% of the amount due.

6.9.    Product Improvement and Modification. Ossur reserves the right to discontinue any Product or to improve or modify a Product or its specifications, in each case without compensation or prior notice to Medline; provided, however, that to the extent that any such modification or improvement affects the form, fit, function or maintenance of a Products or any permissions, consents or licenses related to such Product, and Medline does not consent to such modification or improvement (such consent not to be unreasonably withheld or delayed), Medline shall be relieved of a pro rata portion of the Purchase Requirements relating to such modified Product; and provided, further, that Medline shall also be relieved of a pro rata portion (in the manner set forth in Exhibit A) of the Purchase Requirements relating to any Product discontinued by Ossur. Medline shall promptly notify Ossur in writing of any regulatory approval or authorization that may be required as a result of any such improvement or modification. An order placed by Medline shall be satisfied by the supply of the Products in their form at the date the written order is received by Ossur, except that Ossur may satisfy such orders with modified Products to the extent that the modification does not affect form, fit, function or maintenance or any permissions, consents or licenses.

6.10.    Return of Products. The cost of all returns from customers relating to the Products shall be borne solely by Medline, unless otherwise agreed in writing or in respect of Products which Ossur is obliged to replace as defective in accordance with its warranty as set forth herein. Medline shall advise Ossur of Products requiring replacement and shall forward such Products to Ossur's designated facility, but only after obtaining from Ossur a return authorization approval pursuant to customary return procedures established by Ossur from time to time.

## 7.    Medline's Reporting Obligations

7.1.    Medline shall send to Ossur by the twentieth (20th) day following the end of each calendar quarter during the Term of this Agreement a report in a reasonably acceptable form detailing in respect of that quarter:

   a)    Unit sales by product category for the quarter and year to date.

   b)    Complaints concerning Products and service, if any.

   c)    Any other information regarding the sale of Products that Ossur may reasonably request.

7.2.    Medline shall supply such reports as to stock levels and movements as Ossur may from time to time reasonably request.

7.3.    In order to ensure that Medline can receive adequate inventory of Products as and when needed by Medline, Medline shall provide Ossur each month with a rolling 6-month forecast of the quantities of Products expected to be purchased by Medline hereunder during the period of

8

such forecast. Ossur agrees subject to Force Majeure, to meet Medline's requirements for Products as they are set forth in such forecast, provided (a) that Ossur has received six months' advance notice of Medline's requirements for any given month and (b) that Ossur has not objected to such forecast in writing within ten (10) business days of its receipt thereof. Ossur may object only to forecasts that amount to an increase in Medline's requirements of 30% or more over the aggregate requirements as presented in the immediately preceding month's forecast, but excluding any volume increases which relate to New Products ordered for the first time in any month. If Medline wishes to purchase a quantity in excess of the amount in any such forecast, or if Medline has not provided Ossur with the requisite six months' notice, Ossur shall use commercially reasonable efforts to supply the surplus but shall have no liability for failure to do so.

## 8. Marketing

8.1. The cost of all of Medline's advertising and sales promotion activities specific to the Territory, whether or not provided for in the Marketing Plan, shall, unless otherwise agreed, be borne by Medline.

8.2. Medline is encouraged and allowed to issue, at its own expense, any advertisements, merchandising, publicity material, promotional brochures, technical information, instructions and other literature related to the Products in any of the native languages of the Territory, provided that the content of such advertisement or material has received the prior written approval of Ossur within three (3) business days of the request therefore, such approval not to be unreasonably withheld or delayed, and provided, further, that the applicable Ossur Brand is prominently featured in all such advertisements, merchandise, materials and other literature relating to the Products. Ossur shall in no event be held liable for any such advertisement or material that has not been produced in whole by Ossur.

8.3. Ossur shall supply Medline, free of charge, an initial agreed quantity of pertinent publicity and technical data sheets in English. Medline may, at it own expense, translate such material into any language used in the Territory, but Ossur shall in no event be held responsible for, and Medline hereby indemnifies Ossur for any losses resulting from, any such translated material beyond what is contained in the original English language form of such material as produced by Ossur.

8.4. Once per calendar year during the Term, Medline shall prepare and promptly deliver to Ossur a marketing plan (the "Marketing Plan"), which shall contain detailed information regarding the marketing and sales objectives, strategies and activities and expected sales results by region within the Territory for a period of 18 months as of the date of such report, which Marketing Plan shall be subject to the review and approval of Ossur, and shall be otherwise consistent with Medline's obligations hereunder.

8.5. Medline represents and warrants that it will market, promote or sell any Product only in strict accordance with the packaging and labeling of the Products as provided by Ossur.

9

## 9.   Confidentiality

9.1.   With respect to any Confidential Information disclosed under this Agreement, by one party (the "Disclosing Party") to the other (the "Receiving Party"), the Receiving Party agrees as follows, for the Term of this Agreement, plus a period of five years thereafter:

a)   To use the Confidential Information solely in connection with and in furtherance of its performance of this Agreement, and not for any other purpose.

b)   Not to disclose or otherwise transfer the Confidential Information to any third party and to limit any disclosure only to those of the Receiving Party's licensees, employees, agents, consultants and other representatives who have a need to know the same for the performance of this Agreement, so long as such persons are under an obligation of confidentiality no less stringent than as set forth in this Section 9.

c)   To retain any Confidential Information received from the Disclosing Party under its sole control and to protect it as if it were its own, including using at a minimum such means to prevent its loss, copy or transfer as the Receiving Party employs with respect to its own confidential information.

d)   To immediately inform the Disclosing Party in writing of any accidental loss, misuse or misappropriation of the Confidential Information the Receiving Party may become aware of, including transfer or use by persons not authorized.

9.2.   The parties acknowledge and agree that the use and disclosure of certain technical and other Product-related information of the parties shall be governed by a separate confidentiality agreement between the parties, which shall survive the execution of this Agreement.

9.3.   Medline shall ensure that each of its employees and agents who are reasonably likely to come in contact with Ossur's Confidential Information shall be subject to a written agreement with Medline containing terms comparable to the terms in this Agreement with respect to the maintenance and non-use of Confidential Information.

9.4.   Each party will promptly report to the other any actual or suspected violation of the terms of this Section 9, and will take all reasonable further steps requested by Ossur to prevent, control or remedy any such violation.

9.5.   Each party shall, upon the termination of this Agreement or the request of the other at any time, return to the Disclosing Party all tangible manifestations of Confidential Information (and all copies and reproductions thereof), including, without limitation, any and all results, data or other information produced using Confidential Information.

9.6.   Except as expressly set forth herein, this Agreement shall not be deemed to grant Medline any manufacturing, assembly, production or licensing rights, or any rights in any patents, patent applications, trademarks, tradenames, copyrights or know-how of Ossur.

10

5538/56454-009 NYLIB2/1034150v8

9.7.    The parties hereby acknowledge and agree that any violation of this Section 9 may give rise to irreparable injury to the Disclosing Party, its subsidiaries and/or affiliated companies, inadequately compensable in damages, and that in the event of such violation, the Disclosing Party shall be authorized and entitled to seek from any court of competent jurisdiction, preliminary and permanent injunctive relief as well as an equitable accounting of all profits or benefits arising out of such violation, which rights and remedies shall be cumulative and in addition to any other rights or remedies to which the Disclosing Party shall be entitled under law or under this Agreement.

9.8.    The parties' respective obligations pursuant to this Section 9 shall survive the termination or expiration of this Agreement.

## 10.    Term; Termination

10.1.   This Agreement shall be effective as of the Effective Date for an initial term of five (5) consecutive Quota Periods (the "Initial Term"), which Initial Term shall automatically renew for successive renewal terms of one (1) Quota Period, unless either party notifies the other party in writing of its election not to renew this Agreement, not less than ninety (90) days prior to the expiration of the Initial Term or any renewal term. The Initial Term and any renewal thereof are collectively referred to as the "Term".

10.2.   Termination for Breach. In addition to the right of termination set forth in Sections 6.1 and 6.4, each party shall have the right to terminate this Agreement if the other party is in material breach of any term or condition herein. A party that materially breaches this Agreement shall be given written notice of such breach by the other party and shall have the opportunity to take remedial action within a period of thirty (30) days or other longer period defined in such notice. If the breaching party fails to remedy the breach within such thirty (30) day or other longer defined period, the other party shall have the right to immediately terminate this Agreement; provided, however, that Ossur shall not be required to provide Medline any such cure period with respect to any failure by Medline to purchase the minimum value of Products set forth in the Purchase Requirements in any Quota Period, which failure shall be considered a material breach of this Agreement.

10.3.   Termination for Insolvency. If either party becomes insolvent or files, or has filed against it, any petition under any bankruptcy or insolvency law or similar law which is not dismissed or stayed within sixty (60) days, is adjudged bankrupt or insolvent or the like, makes or attempts to make an assignment for the benefit of creditors or the like, or a trustee in bankruptcy or a receiver is appointed for either party, the other party shall have the right to immediately terminate this Agreement.

10.4.   Effect of Termination. Any expiration or termination of this Agreement shall not alter the rights, duties and obligations of the parties for any purchase orders placed by Medline, or amounts due, prior to the date of such expiration or termination. Upon the termination of this Agreement, Ossur and Medline shall have the following additional rights, remedies and duties with respect to this Agreement and the Products:

a)   Medline shall, at the request of Ossur, promptly return to Ossur all documentation of any nature whatsoever in Medline's possession or control relating to the Products or to Ossur and to the activities of Medline in relation to the Products or Ossur; provided, however, that if Ossur does not exercise its option to repurchase under Section 10.4(b) below, Medline shall return such documentation only when it has sold its remaining saleable inventory of Products in accordance with and in during time period set forth in Section 10.4(b) below.

b)   Ossur shall have the option, in its sole discretion, to purchase from Medline all Products previously purchased by Medline from Ossur and remaining unsold at the time of termination, provided that Ossur does not, in its absolute discretion, regard these Products as not resalable, and Medline shall receive a credit note from Ossur confirming Medline's credit balance to the amount of the purchase price of the Products returned according to this provision. In the event that Ossur does not exercise its option to repurchase hereunder, Medline shall be permitted to sell its remaining inventory of Products in accordance with the terms hereof, notwithstanding the termination or expiration hereof, for an additional period of six (6) months, after which time Medline shall, at its sole expense, return all remaining Products to Ossur for a credit note (except to the extent that Ossur regards such Products as not resalable) or properly dispose of any and all remaining Products;

c)   To the extent necessary or desirable to ensure Ossur's ownership thereof, and to the extent not in violation of Medline's obligations to third parties, Medline shall assign to Ossur free of charge all permissions, consents and licenses (if any) relating to the marketing, distribution or sale of the Products and execute all documents and do all things necessary to ensure that Ossur shall enjoy the benefit of such permissions, consents and licenses after such termination to the entire exclusion of Medline;

d)   Both parties shall remain obligated to perform any other acts which are necessary or appropriate to the orderly winding up of the dealings between the parties hereunder.

## 11.   Intellectual Property Infringement

Either party shall immediately notify all the other any legal action of which it is or becomes aware alleging a violation of any patent, trademark or trade name or any other similar proprietary right affecting the manufacture or sale of the Products (the "Ossur Intellectual Property"), which is filed or threatened. Medline shall promptly report to Ossur the details of any use of which it becomes aware by any other person or entity of the Products, or any patent, trademark, or trade name, which might reasonably amount to infringement of Ossur's patents, trademarks or trade names, or to any unfair competition in the Territory. Ossur shall, at its own expense and in its sole discretion, protect, defend and maintain the Ossur Intellectual Property, for the Term of this Agreement, including filing and prosecuting civil suits for patent infringement against third parties who infringe any patent claiming the Products, the process used to make the Products, or any element thereof, which Ossur either holds or licenses for the

12

purpose of manufacturing or selling the Products. Medline agrees to provide, at Ossur's expense, such reasonable cooperation and assistance as Ossur shall request, with respect to the foregoing.

## 12.     Use of Trademarks

12.1.    Except as expressly provided herein, this Agreement shall not include any license or right to use any Ossur Brand used or claimed by Ossur. Medline shall ensure that the use of any Medline trademarks, trade names, logos or graphics in connection with the promotion of the Products does not infringe any third party intellectual property rights as referred to under Section 12. Medline shall indemnify and hold Ossur harmless for any loss Ossur would incur further to any such third party rights infringement as a result of the use of such Medline trademark, tradename, logo or graphic.

12.2.    Ossur shall obtain and maintain registrations of Ossur's trademarks, and all rights thereunder or thereto shall be for the sole benefit of and shall be solely owned by and in the name of Ossur, and Medline shall cooperate with Ossur to ensure the same. Medline shall not independently apply for or in any way attempt to obtain any such registrations. Medline further agrees that it will not contest, during or after the term of this Agreement, any Ossur Brand that is owned or licensed by Ossur and it will not use, after the term of this Agreement, any such Ossur Brand. Medline will provide Ossur with any information regarding the foregoing that Ossur may request.

## 13.     Recalls and Complaints

13.1.    Medline shall at all times maintain, at its sole cost and expense, and, in the event of a Product recall, Medline shall promptly provide Ossur, a list of Medline customers, including customer contact information and the lot numbers and models of Products purchased by such customers, for the purpose of being able to track Products and otherwise assist Ossur in complying with any statutory or other obligation in respect of a recall of Products sold hereunder. Medline shall provide Ossur the above-mentioned information within forty-eight (48) hours of its notification of a recall. In this regard, Medline agrees to advise Ossur within forty-eight (48) hours of each complaint that Medline may receive or become aware of concerning the Products, including any complaint that any of the Products may have been associated in any way with an injury or death to a user or patient or may have been associated with an incident that could likely cause serious health problems or death. Medline agrees to work with and cooperate with Ossur to resolve complaints. In the event of a Product recall, Ossur shall promptly reimburse Medline for all reasonable out-of-pocket costs and expenses properly incurred by Medline (including, without limitation, all amounts paid to unrelated third parties) in connection with any such recall. Each of Ossur and Medline shall notify the other and the appropriate governmental agencies within the Territory of any reportable product incident of which either Ossur or Medline becomes aware.

13.2.    Medline shall handle all customers' complaints with a level of customer service which is at least equal in quality to the highest level of service provided by Medline to customers with respect to any other products, and shall record all complaints in detail and promptly submit the same to Ossur for its review, as set forth above. Ossur shall be responsible for investigation of

13

the reports and submission of U.S. Medical Device Reports (21 CFR Part 803), and/or other governmental agency reports as required by applicable law or regulation within the Territory.

## 14. Insurance

Each party shall take out occurrence based general liability insurance, including coverage for product liability, in an amount and with limits reasonably acceptable to the other, but in no event less than $1,000,000 per occurrence and $2,000,000 aggregate, and maintain such insurance during the Term, naming the other party as an additional insured party/loss payee thereunder. The terms and conditions of the insurance shall reflect the extent and the nature of the operations involved.

## 15. Warranty – Limitation of Liability

15.1. Ossur warrants that the Products have been and shall be designed, manufactured, labeled, packaged and sold to Medline in accordance with Ossur's quality system and all applicable laws and regulations of the Territory, and that the Products shall: (i) substantially conform to all applicable specifications; (ii) until the "Best Before By" date specified for each Product, be free from defects in material and workmanship and remain in good working order and function in conformity with their respective specifications when used in accordance with all packaging and labeling instructions; (iii) for a period of three years from the date of first manufacture, be free from defects in labeling, packaging and warning as the same are provided by Ossur; and (iv) be free from defects in design. Ossur further warrants that the Products and Ossur Brands do not infringe any third party patent, trademark or other intellectual property rights, and that Products are free from all liens and encumbrances. Ossur shall, at the request of Medline or its customers, promptly replace at its cost and expense any Product found to be defective (in accordance with the foregoing) within the warranty period. Medline shall have no authority to make any representations or warranties concerning the Products other than those set forth above. The foregoing warranty with respect to labeling, packaging and warning shall not apply in the event that Medline has modified a Product or its labeling or packaging as provided by Ossur, or has marketed, promoted or sold such Product other than in accordance with such labeling and packaging.

15.2. OSSUR MAKES NO REPRESENTATION OR WARRANTY WITH REGARD TO ANY PRODUCT OR OTHER ITEM FURNISHED UNDER THIS AGREEMENT EXCEPT AS SPECIFICALLY SET FORTH HEREIN. EXCEPT AS EXPRESSLY PROVIDED HEREIN, OSSUR DISCLAIMS AND MEDLINE WAIVES AND RELEASES ALL OTHER WARRANTIES AND OBLIGATIONS, EXPRESS OR IMPLIED, ARISING BY LAW OR OTHERWISE, WITH RESPECT TO ANY PRODUCTS, INCLUDING BUT NOT LIMITED TO ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, IMPLIED WARRANTY ARISING FROM COURSE OF PERFORMANCE, COURSE OR DEALING OR USAGE OF TRADE, AND ANY IMPLIED WARRANTY OF NONINFRINGEMENT.

15.3. EXCEPT FOR EXPECTANCY DAMAGES RELATING TO MEDLINE'S OBLIGATION TO PURCHASE THE INITIAL QUOTA PERIOD'S PURCHASE REQUIREMENTS, IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER

14

FOR ANY INCIDENTAL, INDIRECT, SPECIAL, EXEMPLARY, PUNITIVE OR
CONSEQUENTIAL DAMAGES, OR FOR LOST PROFITS, SAVINGS, USE,
OPPORTUNITY OR REVENUES OF ANY KIND, OR ANY OTHER COMMERCIAL
DAMAGE, WHETHER OR NOT THE PARTY HAS BEEN ADVISED OF THE
POSSIBILITY OF SUCH DAMAGES OCCURRING, AND WHETHER SUCH DAMAGES
ARISE FROM CONTRACT, NEGLIGENCE, TORT OR OTHERWISE. To the extent that a
party hereto is held liable to any third party for any such punitive or consequential damages as a
result of any act or omission of the other party hereto subject to the indemnification provisions of
Section 16, such damages shall not solely by virtue of this Section 15.3 be excluded or disclaimed.

## 16. Indemnification

16.1.   Medline shall indemnify and defend Ossur, its affiliates, and their respective directors,
officers, representatives, employees, agents, subcontractors, successors and assigns, against and
hold them harmless from any liability, damage, cost or expense (including, without limitation,
any third party claim alleging personal injury or property damage) resulting from or attributable
to any breach of this Agreement by Medline or to any grossly negligent act or omission or willful
misconduct of Medline, its employees, agents or permitted subcontractors in the performance of
this Agreement, except to the extent that a claim is caused by the gross negligence or willful
misconduct of Ossur, its employees, agents or subcontractors.

16.2.   Ossur shall indemnify and defend Medline, its affiliates, and their respective directors,
officers, employees, successors and assigns, against and hold them harmless from any liability,
damage, cost or expense resulting from (i) any claim made by a third party that the Products, or
any one of them, as and in the form delivered to Medline by Ossur, infringe on the intellectual
property of such third party, (ii) any claim made by any third party arising from any recall or
alleging personal injury or property damage relating to any Product and (iii) any claim made by
any third party attributable to any breach of this Agreement by Ossur or to any grossly negligent
act or omission or the willful misconduct of Ossur, its employees, agents or subcontractors in the
performance of this Agreement, in each case except to the extent that a claim is caused by the
gross negligence or willful misconduct of Medline, its employees, agents or subcontractors.

16.3.   In the event of any claim subject to the indemnification provisions of this Section 16, the
party seeking indemnification shall promptly notify the other party in writing, and permit that
party upon its request, to control the defense and/or settlement of the relevant claim. Each party
shall make a reasonable effort to cooperate in such settlement and/or defense and neither party
shall settle any claim for which it is obligated under this Section 16 without the prior written
approval of the other party.

## 17.   Independent Contractor

The relationship of the parties hereunder is that of independent contractors and nothing in
this Agreement creates the relationship of partnership, joint venture, sales agency or principal
and agent, and neither party is the agent of the other, and neither party may hold itself out as
such to any other party, and Medline shall have no power or authority in any way to bind Ossur
contractually. Medline shall be free to manage and control its business as it sees fit without the
management, control or assistance of Ossur, except as otherwise prescribed herein. Except as

15

otherwise set forth herein, all costs of each party's operations, including, but not limited to, salaries, wages, taxes and employee benefits of each party and its employees shall be paid solely by such party, and the other party shall have no liability or responsibility therefor.

## 18.    Force Majeure

Neither Ossur nor Medline can be made responsible for non-performance or delays in performance of any of their obligations under this Agreement if such non-performance or delay results from an event of Force Majeure; provided, however, that the occurrence of a Force Majeure affecting either party shall not affect the right of the other party to terminate this Agreement otherwise in accordance with the terms hereof.

## 19.    Notices

All notices, requests, demands or other communications hereunder shall be in writing, and shall be deemed to have been given (i) when delivered in person or by facsimile transmission, (ii) the next business day after being dispatched by reputable overnight courier, or (iii) seventy-two (72) hours after having been mailed, certified, return receipt requested, postage prepaid, as follows:

If to Ossur:

> Ossur Hf.
> Grjótháls 5
> 110 Reykjavík
> ICELAND
> Fax: +354- 5151367
> Tel.: +354- 5151300
> Attn: G. Fertram Sigurjonsson

> With a copy to:

> Proskauer Rose LLP
> 1585 Broadway
> New York, New York 10036
> Fax: (212) 960-2900
> Tel.: (212) 969-3150
> Attn.: Stuart L. Rosow, Esq.

16

If to Medline:

>Medline Industries, Inc.
>One Medline Place
>Mundelein, Illinois 60060
>Fax: (847) 949-2633
>Tel: (847) 949-3000
>Attn:   Jonathan Primer

>With a copy to:

>Medline Industries, Inc.
>One Medline Place
>Mundelein, Illinois 60060
>Fax: (847) 949-2633
>Tel: (847) 949-3000
>Attn:   Alex Liberman

or to such other address as either party may have furnished to the other in writing in accordance herewith, except that notices of change of address shall only be effective upon receipt.

## 20.   Governing Law and Disputes

20.1.   This Agreement shall be governed in all respects by the laws of the State of New York, without regard to any rules of conflict and choice of laws that would require the application of laws of another jurisdiction. Any controversy or claim rising out of or relating to this Agreement or the validity, inducement or breach thereof, shall be settled by arbitration before one (1) arbitrator in accordance with the Commercial Arbitration Rules of the American Arbitration Association ("AAA") then pertaining, except where those rules conflict with this provision, in which case this provision controls. Such arbitrator shall be an attorney specializing in business litigation who has at least fifteen (15) years of experience with a law firm of over 25 lawyers or was a judge of a court of general jurisdiction. The arbitration shall be held in New York, New York, and the arbitrator shall apply the substantive law of New York, except that the interpretation and enforcement of this arbitration provision shall be governed by the Federal Arbitration Act. Within thirty (30) days of initiation of arbitration, the parties shall reach agreement upon and thereafter follow procedures assuring that the arbitration will be concluded and the award rendered within no more than six (6) months from selection of the arbitrators. Failing such agreement, the AAA will design and the parties will follow such procedures. Each party has the right before or during the arbitration to seek and obtain from the appropriate court provisional remedies such as attachment, preliminary injunction, replevin, etc., to avoid irreparable harm, maintain the status quo or preserve the subject matter of the arbitration. THE ARBITRATOR SHALL NOT AWARD ANY PARTY PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES, AND EACH PARTY IRREVOCABLY WAIVES ANY RIGHT TO SEEK SUCH DAMAGES. The losing party in any arbitration held in accordance with the above shall reimburse the prevailing party for its expenses, including arbitration costs and reasonable attorneys' fees and expenses, incurred in connection with such arbitration.

17

20.2.   The parties hereby consent to the jurisdiction the Federal District Court for the Southern District of New York for the enforcement of these provisions and the entry of judgment on any award rendered hereunder. Should such court for any reason lack jurisdiction, any court with jurisdiction shall enforce this clause and enter judgment on any award.

## 21.   Currency

Unless otherwise agreed, all monetary values and payments arising from this Agreement shall be in United States Dollars for products delivered from Reykjavik.

## 22.   General

22.1.   Assignment. This Agreement and the rights and obligations granted hereunder shall not be assigned or otherwise transferred by Medline, whether by operation of law or otherwise (including, without limitation, by reason of a change in control of Medline), without Ossur's prior written consent. Ossur may assign or otherwise transfer this Agreement and/or the rights and obligations arising hereunder to any affiliate of or successor to Ossur.

22.2.   Amendment. This Agreement may not be amended unless in writing by both parties.

22.3.   Binding Agreement. This Agreement shall be binding upon the parties and their successors and permitted assigns.

22.4.   Severability. If any provision of this Agreement or part thereof is rendered void, illegal or unenforceable in any respect under any law, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

22.5.   No Waivers. The failure to enforce any right will not be deemed a waiver of such or any other right, including the right to enforce a subsequent breach of the same obligation.

22.6.   Authorized Representatives. The individuals executing this Agreement, on behalf of the parties hereby represent that they are authorized to sign this Agreement and have read and fully understand the Agreement and by their execution hereof acknowledge and agree to same on behalf of their respective party.

22.7.   Counterparts. This Agreement may be executed by facsimile and in counterparts, each of which will be deemed an original, and both of which, when taken together, shall be deemed to constitute one and the same instrument.

22.8.   Entire Agreement. This Agreement sets forth the entire understanding and agreement between the parties concerning the subject matter hereof, and supersedes and terminates any prior, contemporaneous, oral or written agreement or representation, if any, between the parties, except for the confidentiality agreement referred to in Section 9.2 hereof, which shall survive the execution hereof.

22.9.   Expenses. Except as specifically set forth in Section 20.1, each party shall pay all of its own fees and expenses (including all legal, accounting and other advisory fees) incurred in

18

connection with the negotiation and execution of this Agreement and the arrangements contemplated hereby.

22.10. Publicity. Upon execution of this Agreement, Ossur and Medline shall issue a joint press release substantially in the form of Exhibit C hereto (the "Release"). Either party shall be entitled to file a redacted copy of this Agreement with any applicable securities exchange or regulatory authority after review thereof by the other party, which review shall be completed in a timely fashion. Except to the extent required by applicable law, neither party shall make any public announcement or statement regarding the relationship of the parties hereunder inconsistent with the Release or any public filings of either party without the prior written consent of the other party, which shall not be unreasonably withheld.

[SIGNATURE PAGES FOLLOW]

19

IN WITNESS WHEREOF, each of the parties has executed this Agreement as of the date first above written.

OSSUR HF

By: _____

Jon Sigurdsson
Chief Executive Officer

MEDLINE INDUSTRIES, INC.

By: _____

Name:
Title:

07/16/2004    13:55    MEDLINE 847-949-3012 → 912129692900    NO.196    P002

IN WITNESS WHEREOF, each of the parties has executed this Agreement as of the date first above written.

OSSUR HF

By: _____

    Jon Sigurdsson
    Chief Executive Officer

MEDLINE INDUSTRIES, INC.

By: _____

    Name: Jonathan Primer
    Title: President, OHS Division

## EXHIBIT A

### PURCHASE REQUIREMENTS

Subject to the terms of this Agreement, during each Quota Period of the Initial Term listed below, Medline shall purchase from Ossur, at a minimum, the value of Products set forth below next to each such Quota Period.

|  | Initial Quota Period | 2nd Quota Period | 3rd Quota Period | 4th Quota Period | 5th Quota Period |
|---|---|---|---|---|---|
| Foam Products* | $1,316,364 | $1,316,364 | $1,316,364 | $1,316,364 | $1,316,364 |
| Gentleheal** | | $861,386 | $1,401,477 | $2,085,284 | $2,931,350 | $3,982,413 |
| Gentleheal AG | $600,000 | $800,000 | $1,400,000 | $1,800,000 | $2,400,000 |
| Total | $2,777,750 | $3,517,841 | $4,801,648 | $6,047,714 | $7,698,777 |

\* The values set forth above for Foam Products are for guidance purposes only and, solely with respect to the Foam Products, do not reflect a minimum purchase commitment.

\*\* Includes Bevel, Standard (3mm), Border, Sacral and Heel.

In the event that a particular Product is not available for sale within the Territory following the date set forth below for such Product, or in the event that a particular Product is discontinued by Ossur, the Purchase Requirement for the Initial Quota Period set forth above with respect to the "Gentleheal" category shall be automatically reduced by a pro rata portion of such Purchase Requirement during such time as such Product is not so available, multiplied by the percentage set forth below for such Product:

| Product | Availability Date | Percentage Reduction |
|---|---|---|
| Bevel | September 30, 2004 | 20% |
| Standard (3mm) | September 30, 2004 | 20% |
| Border | January 31, 2005 | 40% |
| Sacral | January 31, 2005 | 10% |
| Heel | June 30, 2005 | 10% |

By way of example, if the Gentleheal Border Product is not available for sale in the Territory until April 31, 2005 (or, three months following the scheduled availability date), then the initial Quota Period Purchase Requirement for the "Gentleheal" category of Products shall be automatically reduced by $86,138.60, calculated as ($861,386 ÷ 12 months × 3 months × 40%).

In the event that the Gentleheal AG Product is not available for sale within the Territory following June 30, 2005, or in the event that it is discontinued by Ossur, the Purchase Requirement for the initial Quota Period set forth above with respect to the Gentleheal AG Product shall automatically be reduced by a pro rata portion of such Purchase Requirement during such time as such Product is not so available.

By way of example, if the Gentleheal AG Product is not available for sale in the Territory until August 31, 2005 (or, two months following the scheduled availability date), then the initial Quota Period's Purchase Requirement for such Product shall be automatically reduced by $100,000, calculated as ($600,000 ÷ 12 months × 2 months).

# EXHIBIT C

## FORM OF PRESS RELEASE

# Exhibit B



*Life Without Limitations*

**Privileged & Confidential**

March 27, 2008

**By Facsimile**

Medline Industries, Inc.
One Medline Place
Mundelien, Illinois 60060

Termination of Distribution Agreement

Dear Mr. Primer:

As we have discussed, Össur has decided to discontinue its Gentleheal silicone-based wound dressing business, and in furtherance of this decision has entered into an agreement to sell the assets related to this business and to grant certain rights to acquire our U.S. intellectual property relating to these products to a third party. We expect that the Gentleheal business will continue outside the United States following a re-launch of the product line at some later time this year by the third party acquiring this business.

As a result of our decision, Ossur wishes to notify Medline that it intends to cease further shipments of Products to Medline after the end of this month, and that it wishes to terminate, effective March 31, 2008 (the <u>Termination Date</u>"), the Distribution Agreement, dated as of July 16, 2004 (the "<u>Distribution Agreement</u>"), between Össur and Medline. The capitalized terms we used below have the meaning given them in the Distribution Agreement.

Ossur agrees that Medline may continue to sell its existing inventory of Products in the Territory following the Termination Date. Alternatively, Ossur agrees to repurchase any remaining inventory of Products at your purchase cost plus any applicable shipping costs. Neither Ossur or its Gentleheal subsidiary will continue to offer or sell, directly or indirectly, Products in the Territory following the Termination Date.

In furtherance of the above, Ossur acknowledges and agrees that Medline is hereby released from any further obligations to market, promote or sell Products in the Territory, and Medline shall be further released of any obligations to refrain from marketing, promoting or selling any products in the Territory that may be competitive with the Products.

Ossur regrets that for obvious reasons, particularly the unforeseen and unexpectedly costly patent litigation, our business together did not grow and flourish as expected.

ADDRESS  Ossur Head Office      TEL  +354 515 1300      E-MAIL  info@ossur.com
Grjothals 5             FAX  +354 515 1366      WEBSITE  www.ossur.com
110 Reykjavik
Iceland





Life Without Limitations®

We will of course continue to work closely with you to handle any logistical aspects of the termination of our agreement and the distribution and sale of the Products in the Territory.

Please acknowledge the receipt of this letter and your acceptance of its terms by signing in the space provided below.

Sincerely,

ÖSSUR HF

By:

Name: Hilmar B. Janusson
Title:  VP of R&D

cc:    Alex Liberman, Medline Industries


ACCEPTED AND AGREED TO:

MEDLINE INDUSTRIES, INC.


By:_____
Name:
Title:


Notice Copy
Medline Industries, Inc.
One Medline Place
Mundelien, Illinois 60060
Attention: Jonathan Primer
Fax: (847) 949-2633

ADDRESS | Ossur Head Office        TEL | +354 515 1300        E-MAIL | info@ossur.com
Grjothals 5              FAX | +354 515 1366        WEBSITE | www.ossur.com
110 Reykjavik
Iceland

08CV2681   EDA
JUDGE DOW
MAGISTRATE JUDGE COX

# Exhibit C



ÖSSUR.
*Life Without Limitations*

# fax

| attn: | Mr. Jonathan Primer | from: | Ossur hf. |
|---|---|---|---|
| company: | Medline Industries | date: | 2008-03-31 |
| fax: | + 1 847 – 949 - 2633 | direct phone: | + 354 – 515 1300 |
| phone: | | e-mail: | hjanuosson@ossur.com |
| regarding: | **Gentleheal** | pages: | 1+1 |

☐  urgent        ☐  for your review        ☐  please comment        ☐  please reply a.s.a.p

Dear Jonathan

Please find enclosed a confirmation letter regarding the Termination of the Distribution Agreement between our respective companies.

Best regards,

Hilmar B. Janusson
VP of R&D

Notice to Recipient: This fax is confidential and meant only for the intended recipient[s] of the transmission and may be a communication privileged by law. If you received this fax in error, any review, use, dissemination, distribution or copying of this fax is strictly prohibited. If you are not the intended recipient, please contact the sender and please destroy any copies.

ADDRESS | Ossur Head Office
Grjothals 5
110 Reykjavik
Iceland

TEL | +354 515 1300
FAX | +354 515 1366

E-MAIL | info@ossur.com
WEBSITE | www.ossur.com



*Life Without Limitations*

March 31, 2008

**By Facsimile**

Medline Industries, Inc.
One Medline Place
Mundelien, Illinois 60060

Termination of Distribution Agreement

Dear Mr. Primer:

Reference is made to the discussions regarding the discontinuation of the Gentleheal silicone-based wound dressing business and the signed termination letter sent to you 27th of March 2008.

This letter is to confirm that the letter referred above, of 27th of March 2008, terminates the distribution Agreement, dated as of 16 July 2004 between Össur hf. and Medline Industries, effective 31 March 2008.

Sincerely,

ÖSSUR HF

By: _____

Name: Hilmar B. Janusson
Title:    VP of R&D

Notice Copy
Medline Industries, Inc.
One Medline Place
Mundelien, Illinois 60060
Attention: Jonathan Primer
Fax: (847) 949-2633

address  Össur Head Office    tel.  +354 515 1300    e-mail  ossur@ossur.com    internet www.ossur.com
Grjothals 5    fax  +354 515 1366
110 Reykjavik
Iceland